UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

TAMMY SCHMIDT,

Plaintiff,

v.                                              CASE NO. 08-230

EAGLE WASTE & RECYLING, INC.,

Defendant.

_____/

**MEMORANDUM OF LAW IN OPPOSITION TO SUMMARY JUDGMENT**

THE FACTS

Tammy Schmidt was employed by Eagle Waste & Recycling, Inc. from September 2005 until February 22, 2008.  Schmidt dep. 2: 23-25; 3: 1-6.  While Ms. Schmidt's title was "account representative," her duties varied substantially, *infra*. Id. at 3: 3-6.  She was provided a draft of a job description, but never was provided a final version.  Id. at 7: 18-25; 8: 1-25; 9: 1-28.[1]  Ms. Schmidt did not work primarily in sales for Defendant.  Id. at 10: 3-4.  During approximately the first 10 months of her tenure with Defendant, only three percent of Ms. Schmidt's time was devoted to sales, or as she described it, "Not even an hour per day."  Id. at 12: 7-22.  For a time, Defendant operated out of an apartment.  Id. at 13: 6-7.  Ms. Schmidt moved furniture, helped set up a work place, create forms, routine data entry, set up office equipment, helped develop territories, did bookkeeping work, developed a customer data base and assisted in procuring office supplies.  Id.  7-25; Schmidt aff. ¶ 14.  She set up garbage routes for the truck drivers.  Schmidt dep. at 14: 1-2. Ms. Schmidt did some limited servicing of commercial accounts, but through in-office telephone reception; "… since I was the office person, I'd take the call," she

---

[1] Ms. Schmidt also disputes Mr. Albee's contention that he gave her a job description in February 2008.  Schmidt aff.  ¶ 13.

1

testified.  Id. at 14: 25; 15: 1-8.  As to strategy for commercial accounts, Mr. Alan Albee,

company president, would handle all financing aspects of the commercial accounts.  15: 7-19.

She had no decision making authority in these proposals, her involvement limited to discussing

the issues and understanding Mr. Albee's "formula".  Id. at 20-25; 16:  1-10.  In helping to build

a residential client base, Ms. Schmidt did everything from moving appliances, setting up an

office and working on a table "almost the entire time."  Id. at 17-21.  She also talked to folks at

public events, designed the company logo, ordered trash containers, manned the phones, drove

garbage trucks, picked up trash, delivered carts, sitting at her desk doing paperwork such as

troubleshooting routing problems of the drivers.  Id. at 21-25; 18: 1-4; 20: 22-25; 21: 1-8.  Ms,

Schmidt observed, "Once I got to the office, I got stuck in the office."  Id. at 18: 16.  Her

paperwork seldom involved writing sales or commission reports (just 2 days per month).  Id. at

22: 14-25.

        Ms. Schmidt did marketing for the company.  Id. at 23: 13-24.  Her tasks were focused on

marketing for the company as a whole, rather than directed to her individually.  For example, she

designed the company logo, mailers, and newspaper ads.  Id.  She only spent about 10% of her

time promoting herself by talking to folks, dropping off cards, and making fliers.  Id. at 67: 23-

25; 68: 1-4. Ms. Schmidt's marketing activities comprised about 8% of her work week.  Id. at 24:

23-25; 25:  1-6.  Ms. Schmidt engaged in substantial collections work, but it too focused on the

company, not necessarily her individual accounts.  Id. at 25: 10-25;  26: 1-5.  It is significant that

Mr. Albee regarded himself as the other outside salesperson of the company.  Albee dep. 23:

14-18.

        The testimony of Mr. Albee, however, suggested Ms. Schmidt's marketing duties

comprised only a "miscellaneous" part of her job.  Id. at 12:  15-25.  As to designing advertising

2

and logos, Mr. Albee merely acknowledged, "Yes, she assisted with that," he explained.  Id. at 15-20.

Ms. Schmidt also engaged in substantial clerical work.  Schmidt dep. 26: 5-9; Schmidt aff. ¶¶ 14-17.  For example, with respect to billing she testified, "Billing, we did all our billing manually out of the office so it all has to be folded and licked and sticked and organized and taken to the post office."  Schmidt dep. at 26: 5-9.  Mr. Albee essentially corroborated Ms. Schmidt's testimony indicating that she performed clerical tasks such as stuffing such mailings. Albee dep. 13: 21-25; 14: 1-4.

Mr. Albee acknowledged she was in the office greater than 50% of the time during her tenure.  Id. at 17: 15-18.   In fact, Mr. Albee suggested that Ms. Schmidt would only be out of the office doing sales calls without stopping in for no more than two consecutive days, and that this occurred only twice a month.  Id. at 18: 8-25; 19.

Ms. Schmidt had no supervisory authority over employees at the company.  Id. at 20: 11-13.  Although Schmidt testified she would "run" the office in Mr. Albee's absence, Albee disagreed.  "I don't like the word, 'run,'" he said.  Id. at 12:  1-5.  "Tammy *often helped out in* the office when I was not available," he contended.  Id. at 7-8 (Emphasis  added).

Ms. Schmidt's typical work week went beyond a standard 5 days.  She worked week-ends and holidays (where she manned the phones).  Id. at 21:  1-16, Schmidt aff. ¶¶ 5, 17. Ostensibly this was because none of the company's hourly employees would ordinarily paid for holidays.  Schmidt dep. at 21: 22-23. While Mr. Albee denies requiring Ms. Schmidt to work on week-ends and holidays, he certainly was aware of it.  Albee dep. 21: 3-17.

3

Of significance, Schmidt contemporaneously complained that she was not being allowed to do outside sales.  In April of 2007, ten months before her separation from the company, Schmidt wrote that the following hindered her ability to perform outside sales:

1) Having to be back up in the office too much, estimating she spent 40% of time doing administrative work.[2]

2) Handling operations work, "a whole other job I do."  She provided examples of fixing problems on the accounts, handling driver problems, rerouting,  and determination of service areas.  She estimated these activities accounted for 40% of her time.

3) Answering many calls in the office that other staff could not handle.

4) Handling any project [Mr. Albee] needs done, referring to herself as "having to wear many hats."

5) She requested support for "office type" work, such as assistance for paperwork and mailings.

6) She noted, "A true outside sales person is not what I do."  She even asked if Mr.Albee saw such a position within the company.

7) She noted that she lacked authority.

Albee dep. Ex. 7, Schmidt dep., Ex. A.

Not surprisingly, Ms. Schmidt earned more than twice as much in regular salary than commissions during her time with the company.  Id.  When asked if he responded to Ms. Schmidt's concerns in the memo or made any adjustments to her work responsibilities, Mr. Albee could not remember.  Albee dep. 23: 1-13.

---

[2] Although Ms. Schmidt speaks of administrative work, it is logical to conclude that she used the term in the colloquial sense rather than the complex legal definition of the FLSA.

Ms. Schmidt did have outside employment as a real estate agent and waitress; however, because the company kept *absolutely no time records of Schmidt's hours worked* and no time logs as to if or when she left to work at other jobs, it is impossible to grasp with any modicum of accuracy how these other jobs impacted her hours during any particular work week.  Id. at 19: 4-7, 13-17.

Lastly, the company had little or no written policies governing the workplace or Plaintiff's employment.  The company had no written overtime policy.  See Def's Resp. to Requests to Admit No. 11.  The company did not have a personnel manual for use by employees. Id. (Admission No. 12.).   The company had no written policy on holiday pay.  Id. (Admission No. 13.  It did not have a written policy on taking "comp time" in lieu of overtime pay.  Id. (Admission 14).  Finally, as to Ms. Schmidt, there was never an executed contract of employment between Ms. Schmidt and the company.  Id. (Admission No. 10).  There is a dispute between the parties, *supra*, as to whether Plaintiff had a governing written job description, beyond draft form.

<u>THE LAW</u>

<u>Defendant's Heavy Burden</u>

The FLSA does not receive the same judicial construction as other statutes.  "Because of the remedial nature of the FLSA, exemptions are to be 'narrowly construed against the employer's seeking to asset them and their application limited to those establishments plainly and unmistakably within their terms and spirit.'"  See <u>Wang, et. al. v. Chinese Daily News, Inc.</u>, 435 F.Supp.2d 1042, 1051 (C.D. Cal. 2006)(*quoting* <u>Reich v. Newspapers of New England, Inc.</u>, 44 F.3d 1060, 1070 (1st Cir. 1995); <u>Cleveland v. City of Los Angeles</u>, 420 F.3d 981, 988 (9th Cir.

5

2005)).  The FLSA should be interpreted liberally in the employee's favor.  Id. (*citing* Mitchell v. Lublin, McGaughey, & Assoc., 358 U.S. 207, 211 (1959)).  Additionally, an employer bears the burden of proving an exemption by "clear and affirmative evidence."  Id. (*citing* Donovan v. United Video, 725 F.2d 577, 581 (10th Cir. 1984)).  Courts have described the Supreme Court's interpretive admonition, *supra*, as a "strict" one against the employer claiming an exemption. See Miranda –Albino, v. Ferrero, Inc., 455 F.Supp.2d 66, 73 (D.P.R. 2006)(*citing* Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 392 (1960)).

'Breadth of coverage' is vital to [the Act's] mission.'  See Smith v. United Parcel Service, Inc., 890 F.Supp. 523, 526 (S.D W. Va. 1995)(*quoting* Powell v. U.S. Cartridge Co., 399 U.S. 497 (U.S. 1950); Schultz v.W.R. Hartin & Son, Inc., 428 F.2d 186, 189 (4th Cir. 1970)). The Act establishes a presumption of coverage.  Id. (internal citations omitted).

An employer faces a tremendous evidentiary hurdle in proving it an employee is exempt from the FLSA.  "…the employer must demonstrate that its employees meet *every aspect* of the claimed exemption before the employees can be denied the Protection of the FLSA."  See Smith v. United Parcel Service, Inc., 890 F.Supp. 523, 526 (S.D W. Va. 1995)(*quoting* Nettles v.Techplan Corp., 704 F.Supp  95, 99 (D.S.C. 1988); McLaughlin v. McGee Bros. Co. Inc., 681 F.Supp. 1117, 1133 (W.D. N.C. 1988))(Emphasis added).  "Any exemption from such humanitarian and remedial legislation must therefore be narrowly construed, giving due regard to the plain meaning of statutory language and the interest of Congress." See Nicholson v. World Business Network, et al., 105 F.3d 1361 (11th Cir. 1997)(*quoting* A.H. Phillips, Inc. v. Walling, 324 U.S. 490, 493, 65 S.Ct. 807, 808, 89 L.Ed. 1095 (1945)).  But we are also heedful of the rationale for interpreting the FLSA in this way: "To extend an exemption to other than those plainly and unmistakably within its terms and spirit is to abuse the interpretative process and to

frustrate the announced will of the people." Id. (emphasis added). To read the FLSA blindly, without appreciation for the social goals Congress sought, would also do violence to the FLSA's spirit. Id.

Outside Sales Exemption

With respect to the outside sales exemption of the FLSA, a two-pronged test is employed to determine its applicability.  See Reich v. Chicago Title Insurance Co., 853 F.Supp 1325, 1332 (D. Kan. 1994).  At their core, the regulations define an outside salesperson as a 1) an employee who is customarily and regularly engaged away from his employer's place of business; *and*; 2) who does not devote more than 20% of time to activities other than outside sales.  Id.(*citing* 29 C.F.R. § 541.5 (1993))(Emphasis added).  Therefore, in order for defendants to prevail, they must prove both parts of the test; only one of the prongs is insufficient.

In determining the primary duty of an outside sales employee, work performed incidental to and in conjunction with the employee's own outside sales or solicitations, including incidental deliveries and collections, shall be regarded as exempt outside sales work. Other work that furthers the employee's sales efforts also shall be regarded as exempt work including, for example, writing sales reports, updating or revising the employee's sales or display catalogue, planning itineraries and attending sales conferences.  See 29 C.F.R. § 541.500.  (Emphasis added).

Work performed incidental to and in conjunction with the employees own outside sales or solicitations, including incidental deliveries and collections, is not regarded as nonexempt work.  See Champneys v. Ferguson Enterprises, Inc., et al., Cause No IP 02-535-C H/K (S.D.Ind 3/11/2003)(*citing* 29 C.F.R. § 541.5(b).  "Characteristically the outside salesman is one who

makes his sales at his customer's place of business. This is the reverse of sales made by mail or telephone (except where the telephone is used merely as an adjunct to personal calls)." Id. (*citing* 29 C.F.R. § 541.502(b)). *However, the regulations also make it clear that "any fixed site, whether home or office, used by a salesman as a headquarters or for telephonic solicitation of sales must be construed as one of his employer's places of business, even though the employer is not in any formal sense the owner or tenant of the property."* Id. (Emphasis added). *In addition, "promotional work which is incidental to sales made, or to be made, by someone else cannot be considered as exempt work."* Id. (*quoting* 29 C.F.R. § 541.504(a)). (Emphasis added).

For the purpose of this exemption, the regulations distinguish sales work from promotional work. See Amendola v. Bristol-Myers Squibb Co., 558 F.Supp.2d 459, 469 (S.D. N.Y. 2008). "Promotional work that is actually performed incidental to and in conjunction with an employee's own outside sales or solicitations is exempt work. On the other hand, promotional work that is incidental to sales made, or to be made, *by someone else* is not exempt outside sales work." Id. (*citing* 29 C.F.R. § 541.503(a)). (Emphasis added).

A significant difference must be noted between promotional and sales work in evaluating whether an employee meets the outside sales exemption. The distinction was drawn in a 1999 Department of Labor (DOL Opinion Letter). Id. (citing Opinion Letter No. 2138, [1999-02 Wages-Hours] Lab. L. Rep. (CCH) ¶ 33,030 (4/20/1999)). The DOL expressed its view that college recruitment counselors were not exempt outside salespersons because they were "not engaged in making sales of the college's services, or obtaining contracts for its services." Id. Rather, their work was akin to "sales promotion work" because they were "engaged in identifying qualified customers, *i.e.,* students, and inducing their application to the college,

which in turn decides whether to make a contractual offer of its educational services to the applicant." Id.

The purpose of the outside sales exemption has been explained by the Tenth Circuit:

Such salesmen, to a great extent, work[ ] individually. There are no restrictions respecting the time he shall work and he can earn as much or as little, within the range of his ability, as his ambition dictates. In lieu of overtime, he ordinarily receives commissions as extra compensation. He works away from his employer's place of business, is not subject to the personal supervision of his employer, and his employer has no way of knowing the number of hours he works per day Id. at 469 (*citing* Jewel Tea Co. v. Williams, 118 F.2d 202, 207-08 (10th Cir.1941)).

Administrative Employee Exemption

The regulations promulgated by the Department of Labor (DOL) define an "employee employed in a bona fide administrative capacity" as someone whose (1) "primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers" *and* whose (2) "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." Amendola, 558 F.Supp.2d at 427 (*quoting* 29 C.F.R. § 541.200(a))(Emphasis added). Noted, *supra*, the employer must prove both prongs convincingly and clearly.

With respect to prong one, these duties include advertising, marketing, and public relations. Id. at 473 (citing 29 C.F.R. § 541.201(b)). Courts have used as guidance regulations from the financial industry to explain the exemption in general. Id. at 473. Employees in the financial services industry generally *meet the duties requirements for the administrative exemption if their duties include* work such as collecting and analyzing information regarding the

9

customer's income, assets, investments or debts; determining which financial products best meet the customer's needs and financial circumstances; advising the customer regarding the advantages and disadvantages of different financial products; and *marketing, servicing or promoting the employer's financial products*. Id. (Emphasis in original). However, an employee whose primary duty is *selling financial products does not qualify* for the administrative exemption.  Id. (Emphasis in original).

With respect to prong 2, "the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered;" "[t]he term `matters of significance' refers to the level of importance or consequence of the work performed." Id. at 473-74 (*quoting* 29 C.F.R. § 541.202(a)). This second requirement "must be applied in the light of all the facts involved in the particular employment situation." Id. (*citing* § 541.202(b)).

A non-exclusive list of factors that may be relevant to the determination of whether a job entails sufficient discretion and independent judgment includes:  whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; ... whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long-or short-term business objectives; ... and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.  Id. at 474.

Damages Need Only be an Estimate

If the employer fails in its burden to prove the claimed exemption, the Court may analyze whether the employee worked overtime and failed to be compensated accordingly.  Once a plaintiff establishes a violation of the FLSA, the plaintiff must establish damages, and that the task is not a difficult one where the employer has kept time records in compliance with the requirements of the FLSA. In that circumstance, the accurate time records will establish the amount of damages, and the general rule that precludes recovery of uncertain and speculative damages is appropriate.  See Brown v. Family Dollar, 534 F.3d 593, 595 (7th Cir. 2008)(citing Anderson v. Mt. .Clemens Pottery Co., 328 U.S. 680, 687-88 (1946)).  This is a recognition of the need to quantify damages, not a new, more burdensome standard. Anderson also articulated a different standard that was to apply where the employer's records did not provide that accurate record of time worked.  Id.

Anderson recognized that where an employer failed to keep the proper and accurate records required by the FLSA, the employer rather than the employee should bear the consequences of that failure. Id. To place the burden on the employee of proving damages with specificity would defeat the purpose of the FLSA where the employer's own actions in keeping inadequate or inaccurate record had made the best evidence of such damages unavailable. The Court accordingly held that "[i]n such a situation, . . . an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." Id.  The burden then would shift to the employer to produce evidence of the precise amount of work performed or to negate the reasonableness of the inference to be

drawn from the employee's evidence. Id. If the employer fails to meet that burden, a court may award damages even though they are approximations. Id.

## APPLICATION OF THE FACTS TO THE LAW

Outside Sales Exemption

There are genuine issues of material facts as to whether Ms. Schmidt was an outside salesperson.  While Ms. Schmidt did conduct outside sales, these duties were part of a myriad of responsibilities.  We know from her testimony that she performed clerical tasks, bookkeeping, setting up of office equipment, route scheduling for the truck drivers (sometimes driving the garbage herself), handled the phones on week-ends and holidays, provided phone back-up in the office, sited the location of garbage containers at community festivals, manually set up banners, man booths at such festivals assisting in overall company public relations Schmidt dep. 113: 2-25; 114:  1-13) did collection work for the company as a whole, "assisted" in advertising/promotion on behalf of the company, and "helped" Mr. Albee in his absence.  We know that the time she spent preparing commission or sales reports was negligible.   Mr. Albee concedes she was in the office more than fifty percent of the time and never was out of the office for more than two days at a time doing outside sales.  Mr. Albee did not allow her to attend sales specialized training conferences (Schmidt aff. ¶ 17), the evidence is conflicting as to whether she was hired as an outside salesperson.  The record is devoid of evidence that her position was advertised as an outside sales position.  According to Amendola, all these factors suggest she was not an outside salesperson.  558 F.Supp. at 471. (Internal citations omitted.)   As discussed in Amendola, supra, the question in mixed duties cases is whether Ms. Schmidt primarily was a salesperson.  The evidence is murky at best.

Discussed, *supra*, the promotional work she performed was not to promote her sales only. Mr. Albee also considered himself an outside sales person and the advertising and marketing work also benefited him.  While Ms. Schmidt regarded herself as the leader of public relations for the company, Mr. Albee considered her to be nothing more than an assistant.  Ms. Schmidt indeed wore many hats, but so many hats does not an outside salesperson make.

The foregoing suggests that Ms. Schmidt was not customarily and regularly engaged away from the employer's place of business.  In fact, the reverse is true.  She was customarily and regularly engaged in work at the office that was not incidental to her limited, individual role in outside sales.

Administrative Employee Exemption

**Defendant should be estopped from claiming Ms. Schmidt was an administrative employee.**  Defendant does not mention the administrative exemption or the outside salesperson exemption in its answer.  Doc. 4-2 at 3-4.  The first time the defendant raised the outside salesperson exemption in the parties Joint Rule 26(f) Conference Report.  Doc. 6 at 2.  Nowhere in the report does Defendant indicate it intended to rely on the administrative employee exemption.  Id.  Further prejudicing Plaintiff, Defendant denied in Request to Admit 8 that Plaintiff was exempt as an administrative employee.  *See* Def's Resp. to First Request to Admit.

Rule 36 assures each party that its "justified reliance on an admission in preparation for trial will not operate to its prejudice."  *See* U.S. v. $30,854 in United States Currency, 863 F.Supp. 442, 445 (W.D. Ky. 1994)(*quoting* Fed. R. Civ. P. 36 advisory committee comments)). There is no apparent reason such reliance should not apply to denials.  Plaintiff relied on Defendant's representations and admissions.  The denial, *supra*, in Defendant's response to

13

Plaintiff's Request to Admit is particularly prejudicial.  Plaintiff moved on with an official assurance that Defendant would not raise this defense.  Had Plaintiff known, she would have tailored her discovery plan differently to focus on the defense.  Now that the dispositive motions deadline has passed, Defendant seeks to gain advantage by surprise.  For the past seven months Defendant stood idly by without giving even a hint of its intentions.  Defendant knew what Plaintiff's job responsibilities were all along.  It cannot claim at the Eleventh Hour that suddenly based on purported revelations in discovery that it is just now realizing that Plaintiff is supposedly exempt as an administrative employee.  Defendant had what it deemed sufficient information to make the outside salesperson exemption argument, why did it not also have the information necessary to at least minimally advance its administrative employee defense in a timely fashion?[3]

In summary, Defendant misled Plaintiff on three occasions:

1) It failed to address the administrative exemption in its answer.

2) It failed to address the administrative exemption in the Joint Rule 26(f) Conference Report.

3) It specifically denied Plaintiff was an administrative employee in responding to requests for admissions.

Because of this behavior and the resulting undue prejudice to Plaintiff, the Court should employ the old proverb:  Three strikes and you're out.

---

[3] If the Court decides it wants to consider the administrative employee defense, Plaintiff respectfully requests that it be given an opportunity to re-depose Mr. Albee and a corporate representative as to this defense before ruling on summary judgment to foster a fair examination of the issues.  Defendant should be sanctioned in whatever manner the Court deems necessary, including an award of attorney's fees and costs for the extra discovery necessitated by Defendant's filing of a misleading response to a Request to Admit.

In an abundance of caution, however, Plaintiff submits her duties were not primarily administrative under the FLSA.  Mr. Albee did everything in possible in his testimony, *supra*, to describe plaintiff as a mere assistant in marketing and promotion efforts.  He disputed that Ms. Schmidt ran the office in his absence, indicating that she was just a helper.

Mr. Albee called all the shots on anything having to do with essential business operations.  With respect to creating ads, Ms. Schmidt did much of the design work, but it was manual in nature, such as inputting text and typesetting, and presenting drafts to Mr. Albee for his approval.  Schmidt aff. ¶ 9.  As her affidavit suggests, she drafted materials, left them for Mr. Albee for edits and approval, rather than necessarily make a pitch or recommendation for approval of a particular ad.

The same was true for the logo.  While Ms. Schmidt designed the logo with the assistance of a printing company, she did so under the close eye of Mr. Albee.  Schmidt aff. ¶ 10.  The theme and design parameters were set by Mr. Albee who micromanaged the project to its completion.  Id.

Also indicative of how Mr. Albee micromanaged Ms. Schmidt's activities, is the way customer accounts were serviced.  For example, any credit to customers over $5 had to be personally approved by Mr. Albee, as well as quotes on accounts that did not exceed 25% above cost.  Id., ¶ 11.  At least for part of her tenure, Ms. Schmidt could not make a purchase of any kind or amount, without the approval of Mr. Albee.  Id.  In addition, suspension of service to customers regularly occurred if an account was past due 30 days or more, unless personally approved by Mr. Albee.  Id. at ¶ 12.

By contrast, Ms. Schmidt's "administrative" duties involved substantial manual labor. These duties included substantial routine data entry until extra clerical staff came on board.  Id. at ¶ 16.

Plaintiff has Adequately Proved Damages

Discussed, *supra*, because Defendant failed to keep any time records whatsoever for Ms. Schmidt, the burden shifts to Eagle Waste to prove that Plaintiff did not work compensable hours with greater certainty.  Ms. Schmidt's calculations only need to be an approximation.   A fact-finder can reasonably determine Ms. Schmidt's entitlement based on Ms. Schmidt's affidavit indicating how she arrived at the number of hours worked per week during her tenure.  Schmidt aff. ¶¶ 4-5.  Plaintiff also provided this information without objection in its methodology in its voluntary Rule 26 disclosures to Defendant early on in the litigation.

CONCLUSION

Because of the many facts in dispute and the voluminous case law, *supra*, making it Defendant's burden to prove an exemption, and the narrow construction given to claimed exemptions, summary judgment should be denied.  Only the fact-finder in a full trial on the merits can sort out all the evidence in a case where so much is in dispute.

CERTIFICATE OF SERVICE

I certify that a copy of this document was provided via electronic filing to Geoff Trotier, Esq., Davis & Kuelthau, S.C., attorneys for defendant, 111 E. Kilbourn Ave., Milwaukee, WI 53201, this 4th day of December, 2008.

16

_____/s/_____

SAMUEL C. GOLD, ESQ.

Wis. Bar No. 1040727

4825 Pike Bay Rd., No. 11

Eagle River, WI  54521

715-617-1180